UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

EDMUND ROGALSKI,

                              Plaintiff,

v.                                                        Case # 13-CV-06422-FPG

                                                          DECISION AND ORDER

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.


## I.    Introduction

Plaintiff Edmund Rogalski ("Plaintiff"), through his attorney Donald R. Bleier, Esq.,

brings this action pursuant to Title II of the Social Security Act ("SSA"), seeking review of the

portion of the final decision of the Commissioner of Social Security ("Commissioner") that

denied his application for Disability Insurance Benefits ("DIB"). ECF No. 1. Plaintiff does not

contest the portion of the Commissioner's decision that he became disabled on November 12,

2008 and is entitled to Supplemental Security Income ("SSI") under Title XVI of the SSA. Tr.

1.[1] Plaintiff only challenges the Administrative Law Judge's ("ALJ") finding that he was not

entitled to DIB. ECF No. 10-1, at 1. The Court has jurisdiction over this matter under 42 U.S.C.

§§ 405(g) and 1383(c)(3).

Each party has duly submitted a motion for judgment on the pleadings pursuant to

Federal Rule of Civil Procedure 12(c). ECF Nos.10, 11. Defendant has additionally filed a

memorandum of law in response to Plaintiff's Motion for Judgment on the Pleadings. ECF No.

13.  For the reasons set forth below, I find the Commissioner's decision is supported by

---

[1] All references to the administrative record will be reflected as ("Tr."), with accompanying page number(s).

substantial evidence in the record and without legal error. Therefore, I grant the Commissioner's

Motion for Judgment on the Pleadings and dismiss Plaintiff's claim.

## II.   Background

The parties agree that the issue in this case is whether substantial evidence supports the

Commissioner's decision that Plaintiff did not become disabled prior to November 12, 2008.

ECF No. 10-1, at 3; 11-1, at 3.   Accordingly, I will focus particularly on the record evidence

between December 20, 2005, Plaintiff's alleged date of disability onset for his DIB claim, and

November 12, 2008. Tr. 141.

### a.  Procedural History

Plaintiff's claims for SSI and DIB have been heard by two separate ALJs, with an

intervening SSA Appeals Council decision. Tr. 11, 83, 97. The second Appeals Council decision,

dated June 20, 2013, affirmed the determination of the second ALJ that Plaintiff was entitled to

receive SSI benefits, but not DIB. Tr. 1. This makes the determination of the second ALJ on

March 14, 2012 the final decision of the Acting Commissioner of Social Security. Mr.

Rogalski's case is thus ripe for my review.

Plaintiff initially filed for DIB under Title II of the SSA on April 15, 2008. Tr. 93. He

alleged that disabling conditions made him unable to work as of October 15, 2001. Tr. 230-232.

Plaintiff claimed, generally, that issues related to his back, knees, depression, and anxiety

rendered him unable to work. *Id.* Plaintiff later amended his DIB onset date to December 20,

2005. Tr. 141. An initial Disability Determination and Transmittal denied Plaintiff's claim on

October, 14, 2008. Tr. 81-82. In response, Plaintiff requested a hearing, at which he appeared via

videoconference before ALJ Mark Solomon on June 23, 2010. Tr. 87. Plaintiff further sought

SSI under Title XVI of the SSA in an additional claim filed on March 23, 2010. Tr. 140. ALJ

Solomon consolidated the SSI and DIB claims. Tr. 40.

On July 13, 2010, ALJ Solomon issued a partially favorable decision in Plaintiff's case.

Tr. 83. The ALJ found Plaintiff became disabled on March 23, 2010, entitling him to SSI

benefits under Title XVI of the SSA. Tr. 87. ALJ Solomon determined Plaintiff suffered from

two severe impairments: bilateral knee and mild left hip degeneration, as well as mild cervical

degenerative disk disease. Tr. 89. Beginning March 23, 2010, the ALJ determined that no jobs

existed in significant numbers in the national economy that Plaintiff could perform. Tr. 93. The

ALJ also found Plaintiff was not disabled at any time prior to December 31, 2006, his date last

insured ("DLI"). Tr. 87. Accordingly, Plaintiff was not entitled to DIB. *Id.*

Plaintiff, through his attorney Mr. Bleier, sought review by the SSA Appeals Council of

ALJ Solomon's decision. Tr. 331-333. The Appeals Council, having reviewed the ALJ's July 13,

2010 decision, affirmed the ALJ's finding that Plaintiff was disabled on March 23, 2010 and is

entitled to SSI. Tr. 98. The Appeals Council vacated the portion of the ALJ's decision relating to

Plaintiff's DIB claims under Title II and remanded it to the ALJ for further development of the

record.[2] Tr. 98-99.

ALJ Michael W. Devlin presided over Plaintiff's case on remand. Tr. 15. Plaintiff, again

represented by Mr. Bleier, appeared in person and testified at a hearing before ALJ Devlin on

January 26, 2012 in Rochester, NY. *Id.* Vocational Expert ("VE") Julie A. Andrews also

---

[2] The Appeals Council specifically directed the ALJ on remand to: (1) further evaluate Plaintiff's mental impairment in accordance with the special technique under 20 C.F.R. 404.1520a(c) and 416.920a(c); (2) further consider Plaintiff's residual functioning capacity, including "rationale with specific references to evidence of record in support of addressed limitations"; and (3) if warranted by the expanded record, solicit testimony from a vocational expert to clarify the effect of the assessed limitations established by the record as a whole, including the vocational expert's identification of appropriate jobs for Plaintiff and their availability in the national and local economies. Tr. 98-99.

appeared and testified at the hearing before ALJ Devlin, pursuant to the Appeal's Council's instructions. *Id.*

On March 14, 2012, ALJ Devlin issued the second partially favorable decision relating to Plaintiff's claim. Tr. 11. The ALJ concluded that Plaintiff "was not disabled prior to November 12, 2008, but became disabled on that date and has continued to be disabled through the date of this decision." Tr. 16. This meant Plaintiff was not disabled at any time through his DLI, December 31, 2006. *Id.* The decision preserved the status quo: Plaintiff would continue to receive SSI benefits, but not DIB. Tr. 15.

Plaintiff again appealed the ALJ's decision on May 15, 2012. Tr. 6. He specifically contended that ALJ Devlin, like the first ALJ, improperly provided details of his consideration of mental health issues and resulting limitations. *Id.* Plaintiff further alleged that the ALJ failed to properly address the alleged severe effects of Plaintiff's wrist impairments on Plaintiff's residual functioning capacity as well as whether Plaintiff's various knee ailments meet Listing 1.02 of Impairments under 20 C.F.R. Pt 404, Subpt. P. App. 1. Tr. 7-9. Finally, Plaintiff challenged ALJ Devlin's consideration of Plaintiff's residual functioning capacity and ALJ Devlin's "evaluation of credibility." Tr. 9-10.

The Appeals Council denied Plaintiff's request for review on June 20, 2013, finding "no reason to review the Administrative Law Judge's decision" for DIB. Tr. 1. The Appeals Council's denial makes ALJ Devlin's decision the final decision of the Acting Commissioner of Social Security in  Plaintiff's case. *Id.* The Appeals Council noted that Plaintiff's SSI determination remained "fully favorable" and that his SSI payments would continue. *Id.*

On August 12, 2013, Plaintiff timely commenced the present action for review under 42 U.S.C. § 405(g). ECF No.1. Plaintiff claims the Commissioner's decision that he is not entitled

4

to DIB is erroneous and supported by neither substantial evidence in the record nor the applicable law. *Id.*

### b. Factual Background

Plaintiff Edmund Rogalski was born on November 12, 1958. Tr. 81. He completed schooling up to grade twelve and is a non-combat veteran of the Army and Army Reserves. Tr. 43, 374. Plaintiff began working as a tool and die maker when he left the Regular Army in 1978. Tr. 74. He worked in this trade until October 2001, when he claims his medical ailments made him unable to continue. Tr. 43. Plaintiff reported he lost his job as a machinist because knee pain made him incapable of standing for sustained periods of time. Tr. 592. Six months after he stopped working, Plaintiff described his knee pain level as a "ten" out of ten, with ten being the worst. Tr. 590. He worked for an unknown period around 2002 through a Monroe County Department of Social Services program in exchange for housing subsidies. Tr. 590-591.

Plaintiff was insured though December 31, 2006. Tr. 15. Accordingly, he must establish disability on or before this DLI in order to be entitled to receive DIB. 20 C.F.R. § 404.131(a). Although there are indications in the record that no particular event precipitated Plaintiff's knee issues (*See* Tr. 475, 588, 589), there are other references in the record to a "twisting type injury" that might have involved a Frisbee game causing his knee pain. Tr. 565, 582, 588.

In May 2002, Plaintiff claimed to be "out looking for work" during a period when he was alleging disability. Tr. 586. He performed volunteer work involving therapy dogs at a nursing home in summer 2002. Tr. 568. Plaintiff also claims that, between 2001 and 2008, he "tried working at a couple machine shops" for "about a month at a time," but he experienced pain that prevented him from continuing work. Tr. 46. In February 2003, Plaintiff claimed he was unable to secure work in his field because he "fails the physicals for his job interviews." Tr. 565. He

reported later in 2003 that he had obtained "a full time job doing maintenance." Tr. 561. On September 15, 2004, Richard Mottern, M.D., noted that Plaintiff told him "he has been extremely active with his job as a contractor up and down ladders all day long." Tr. 557. Plaintiff later elaborated that he had been "employed at this firm for about one year" during that same 2004 time period. Tr. 544. There is no record evidence that Plaintiff received an income from work at any time after 2001, despite these claims. Tr. 246.

Plaintiff has testified to having psychiatric ailments, including depression, anxiety, and panic attacks. Tr. 70. He claims these began to bother him in 1997. *Id.* He describes his panic attacks as causing his hands to shake and making him unable to interact with others. Tr. 71. He testified that, despite regular checkups with Dr. Banzhaf at the Veterans Affairs Hospital in Canandaigua and receiving medication for these episodes, his panic attacks persist. Tr. 72-73. Plaintiff further acknowledges having alcohol problems over the years, at times drinking to supplement his pain medications. *Id.*

Plaintiff entered an inpatient Veterans Affairs-sponsored alcohol rehabilitation program on his own accord on September 27, 2004. Tr. 556. He claimed that at the time he sought treatment because "I lost my job and started drinking." *Id.* Plaintiff told counsellors he lost an unspecified job approximately a week and a half prior. *Id.* There appears to be a reference to this job in a September 29, 2004 Behavioral Health Treatment Plan note, which states: "patient indicate [sic] he has been employed however he has [sic] earning a living without paying any New York State and/or federal taxes." Tr. 551.

Plaintiff testified via videoconference before ALJ Solomon on June 23, 2010. Tr. 39. He answered questions from both the ALJ and his own attorney, Mr. Bleier. Tr. 40, 49. Prior to December of 2006, Plaintiff claims he required ambulatory assistance "with a cane and

6

sometimes a walker." Tr. 44. During a typical day, Plaintiff testified he would "[w]alk around the trailer sometimes, just to get some exercise," referring to the trailer in which he and a friend were then residing. Tr. 48. Plaintiff testified it was "difficult" for him to take care of his own personal needs on a daily basis, but that he "made it through." Tr. 47. He claimed that activities that required periods of standing, particularly cooking and showering, were "a bit of a challenge." *Id.* He remembers being treated for ongoing panic attacks around the time of his December 2006 DLI. Tr. 53. Plaintiff estimated that the problems with his hip and lower back date back to at least 2004, describing his hip discomfort as "shooting pains" during that time period. Tr. 54. Pain in Plaintiff's left hip grew "progressively worse" from the end of 2006 until the time of his testimony in June 2010, he told the ALJ. Tr. 51.

Plaintiff testified that he, several times, tried to help train student apprentices in the trade of tool and die making. Tr. 69-70. He did not recall precisely when he assisted in training apprentices, estimating it was 2002 and 2004. Tr. 70. He claims he mostly assisted the students with mathematics, because he "couldn't do anything physically" as a result of his ailments. Tr. 69.

Plaintiff admitted to prior history of problematic drinking, but said he drank alcohol "once or twice in a couple weeks" around the time of the June 2010 hearing and had "experimented with [cocaine] once many, many years ago." Tr. 45. Though Plaintiff testified to having nearly daily panic attacks at the time of the videoconference hearing before the ALJ in June 2010, he testified that these attacks were not occurring as frequently around the time of his December 31, 2006 DLI. Tr. 53.

Plaintiff testified in-person before ALJ Devlin on January 26, 2012. Tr. 63. The ALJ noted that the Appeals Counsel ordered further development of the record in Plaintiff's case. Tr.

7

59. Plaintiff claimed his right knee "didn't heal" after a June 2002 arthroscopic surgery meant to repair the knee. Tr. 63. He testified that he was using a cane and sometimes a walker to ambulate in the time period between December 2005 and November 2008. Tr. 64-65, 513. He said stairs posed "the worst" problem for him and that he "can't go up or down" stairs. Tr. 64. Plaintiff described experiencing numbness in both legs after periods of staying in the same position. Tr. 66. He also testified that he felt the sensation of "bone on bone rubbing" in his lower back during the same time period. Tr. 65-66.

Plaintiff periodically received Synvisc injections to alleviate his knee pain. Tr. 67. He testified that the injections would help with the pain "for about two weeks" before the earlier pain would return. Tr. 67. Between December of 2005 and November of 2008, Plaintiff estimates he could have sat for about forty-five minutes or stood for "no more than a half hour" without experiencing discomfort or pain. Tr. 67. During the same time period, he estimated he could walk about one city block with the assistance of a cane before he would need to sit down and rest. Tr. 68. He estimates he could lift "maybe five pounds" in the December 2005 through November 2008 time period, telling ALJ Devlin "it was too painful" when he attempted to go back to work and had to lift objects. Tr. 69.

Julie A. Andrews, the VE, offered testimony at Plaintiff's January 26, 2012 hearing before ALJ Devlin. Tr. 75. The VE classified Plaintiff's past relevant work as a tool and die maker, Dictionary of Occupational Titles ("DOT") Code 601.260-010. Tr. 75. She noted this is a highly skilled, medium exertion position that would carry transferable skills, including the ability to compute, compile, and analyze data as well as the ability to work within precise limits. Tr. 75-76.

ALJ Devlin proffered a hypothetical to VE Andrews, asking her to assume an individual aged 47 to 49 with a high school education and past relevant work as a tool and die maker. *Id.* The hypothetical individual can occasionally lift and/or carry less than ten pounds, stand and/or walk at least two hours during an eight-hour work day, be allowed to use a cane to ambulate to and from his workstation, never push or pull with his lower extremities, and occasionally push or pull less than ten pounds with his upper extremities. *Id.* The hypothetical individual is rarely able to climb ramps and/or stairs, balance, stoop, kneel, crouch, or crawl. *Id.* He can never climb ladders, ropes, or scaffolds. Tr. 77. He is able to understand, remember, and carry out simple and detailed instructions and tasks, as well as consistently maintain concentration and focus for up to two hours at a time. *Id.* The VE responded that she could identify multiple jobs in the national and local economies for the hypothetical individual. *Id.*

The VE identified an order clerk position, DOT Code 209.567-014, with 255,000 positions in the national economy and 425 positions in the regional economy, here encompassing the Finger Lakes Region of New York State as deemed by the New York State Department of Labor. *Id.* In addition, she identified label pinker, DOT Code 585.685-062, as a job that could be performed by someone with the limitations set forth by the ALJ. *Id.* VE testified there exist 1.3 million label pinker positions in the national economy and 455 regionally. *Id.* The ALJ then posed a second hypothetical individual to the VE, asking her to assume the same parameters as in the first except that the second hypothetical individual is only able to sit for less than six hours in an eight-hour workday and walk less than two hours in an eight-hour workday. Tr. 78. Given these facts, the VE was unable to identify full-time jobs on a competitive basis for the second hypothetical individual. *Id.* Plaintiff's attorney told the ALJ he had no outstanding evidence to

present and that the record was complete at the conclusion of the January 26, 2012 hearing. Tr. 80.

### c. Medical Evidence of Physical Ailments

On February 15, 2002, Mary L. Matthew, M.D. observed Plaintiff at the Veterans Affairs Medical Clinic ("VAMC") in Canandaigua, NY. Tr. 592. Plaintiff presented as a forty-three year old being treated for lower back pain, knee pain, chronic alcoholism, and depression. *Id.* He complained specifically of ongoing pain in his right knee. *Id.* X-rays showed his right knee was "clearly swollen." Tr. 593. Dr. Matthew ordered further x-rays and referred Plaintiff to the VAMC orthopedic service in Buffalo, NY for further evaluation. *Id.*

John Haumesser, M.D., engaged in an initial consultation with Plaintiff related to his complaints of right knee pain on March 26, 2002. Tr. 588. Reviewing x-rays of Plaintiff's knee taken on February 15, 2002, Dr. Haumesser noted a mild degenerative change at medial compartment of Plaintiff's right knee joint. Tr. 589. He ordered an MRI of Plaintiff's right knee. *Id.*

After Plaintiff underwent the MRI on his right knee, he met with Physician Assistant ("PA") Craig Meinking on May 3, 2002. Tr. 587. The PA reviewed the MRI and noted significant joint effusion, degenerative changes on both his left and right menisci, and findings consistent with probable meniscal capsule separation. Tr. 587-588. The PA reported "[n]o obvious meniscal tear." Tr. 588. The PA discussed with Plaintiff possible arthroscopic surgery related to his knee issues, but Plaintiff instead opted to undergo joint injections to treat the pain. *Id.* The PA also noted that Plaintiff will be "released to return to work" in the event the injections improve his condition. *Id.*

Plaintiff attended a follow-up appointment with PA James J. Mikulsky on June 4, 2002. Tr. 582. Plaintiff told the PA that steroid injections he received in his right knee only alleviated his pain for about 24 hours. Tr. 582. As a result, Plaintiff opted this time to undergo elective right knee arthroscopy on June 13, 2002. Tr. 584. Plaintiff was issued a right knee brace and a straight wooden cane to assist with ambulation. *Id.*

Israel Ziv, M.D., performed arthroscopic surgery on Plaintiff's right knee on June 13, 2002. Tr. 571. Dr. Ziv performed a right knee arthroscopy with removal of loose body. *Id.* Plaintiff's postoperative diagnoses were right knee chondromalacia patella, osteoarthrosis, and loose body. *Id.* One week after the surgery, Dr. Ziv reported that Plaintiff was walking with a "minimal limp" and that he "uses a cane for longer walks." Tr. 571. The surgery apparently reduced Plaintiff's pain level in the short term, but his earlier pain level eventually returned. Tr. 565, 568, 571. An orthopedic note entered six weeks after the surgery noted Plaintiff was "back to work" and did not require a cane for ambulation. Tr. 568.

In the years after the surgery, Plaintiff noted on multiple occasions that the surgery helped his knee pain "for about six months" before his earlier pain returned. Tr. 475, 492, 568. He stated that in 2003 he received injections to treat his knee pain that similarly provided about six months' worth of pain relief. Tr. 492.

Plaintiff met with Dr. Ziv on January 4, 2006 for an orthopedic consult. Tr. 505. Plaintiff complained of hip pain that he said had been ongoing for two years. *Id.* Dr. Ziv noted normal gait and that Plaintiff had the ability to squat to 120 degrees with pain. Tr. 506. Dr. Ziv also noted no deformity or effusion in Plaintiff's knees. *Id.* Plaintiff complained of general pain at a level of six on a scale of one to ten on June 18, 2006. Tr. 495. He told Dr. Mottern his knees

remained his primary source of pain at this time while he secondarily was experiencing left hip pain and, to an even lesser extent, pain in his hands. *Id.*

On June 29, 2006, Physical Therapist ("PT") Brian Westlake met with Plaintiff and evaluated his knee ailments. Tr. 491. The PT noted that Plaintiff works as a tool maker, requiring considerable "standing, lifting, bending, [and] twisting." Tr. 492. Plaintiff was at this time walking without an assistive device. *Id.* Plaintiff reported to the PT that his "knee pain affects his abilities to perform his duties at work as a tool maker." Tr. 492-493. The time of this visit is notable because it was during the period Plaintiff was alleging disability and six months before Plaintiff's DLI. Tr. 17. Plaintiff also appears to claim to have been presently working during this time when he reported no income. Tr. 246, 492.

On July 24, 2006, Dr. Nandini Joshi fitted Plaintiff with stabilization braces for both his knees. Tr. 490. Plaintiff again stated at this appointment that he was currently working as a tool maker and had to do prolonged standing, lifting, and bending for his job. Tr. 489. At a follow-up appointment one week later, Plaintiff told Dr. Joshi his knee pain persisted "even at rest." Tr. 487. Plaintiff also indicated during a December 20, 2006 pain consultation that he was currently working as a tool maker, had to stand, lift, bend, and twist for his job. Tr. 475. Plaintiff told Dr. Joshi during a January 18, 2007 appointment that his bilateral knee pain bothered him "mostly during weightbearing." Tr. 474.

On January 16, 2007, Plaintiff received an MRI on his right knee. Tr. 343-345. Radiologist Angelo DelBalso, M.D., found Plaintiff's lateral and medial collateral complexes to be intact and observed no gross abnormalities in Plaintiff's medial meniscus. Tr. 344. He identified "small/moderate" joint effusion and chondromalacic changes in the medial compartment of Plaintiff's right knee. Tr. 344-345.

12

At a follow-up appointment with Nurse Practitioner ("NP") Jacqueline Coates on February 14, 2007, Plaintiff reported having "constant bilateral knee pain" with a pain level of "generally 8/10." Tr. 467. He reported "occasional swelling" in both knees and continued to take Vicodin to manage the pain. Plaintiff received a trial treatment of transcutaneous electrical nerve stimulation ("TENS") to treat his bilateral knee pain beginning on February 28, 2007. Tr. 466.

Plaintiff received another MRI of his right knee on April 6, 2007. Tr. 463-466. Physician Assistant Gerald Malabre reviewed the MRI. Tr. 463. While he found no gross abnormalities in the meniscus, the PA did note "small/moderate joint effusion," chondromalacic changes in Plaintiff's right knee cartilage, and "significant chondromalacic changes/chondrolysis" of Plaintiff's medial condyle. Tr. 465. As of November 9, 2007, Plaintiff was taking three Vicodin daily to relieve his knee pain. Tr. 455.

On April 11, 2008, Plaintiff was examined by William D. McKenzie, M.D. based on a referral for his knee pain. Tr. 430. Dr. McKenzie performed a physical evaluation and noted no effusion in either knee, as well as "full flexion and extension of both knees." *Id.* Plaintiff stated he was feeling "comfortable at rest," but experienced pain in both knees during weightbearing activities. *Id.*

### d.  Medical Evidence of Psychiatric Ailments

Plaintiff also alleges disability stemming from mental illnesses, including depression, anxiety, and panic attacks. Tr. 70, 73.

Plaintiff sat for a behavioral health assessment with Amy D. Warner, Psychiatric NP on February 28, 2002.  Tr. 590. He reported taking Sertraline to help deal with his irritability and inability to cope with daily stressors. *Id.* Plaintiff identified bilateral knee pain as his main stressor. *Id.* Nurse Practitioner Warner noted Plaintiff's medical records "indicate a lengthy

history of dependence upon alcohol and use of cannabis and cocaine." *Id.* Plaintiff's mental health diagnoses included depression and alcohol dependence in full sustained remission. Tr. 591.

Plaintiff first met with Donald Banzhaf, Psychiatrist, on April 27, 2005. Tr. 528. Plaintiff claimed he was having suicidal ideations in the "last couple of days" before the appointment. Tr. 530. Dr. Banzhaf found Plaintiff cooperative with normal speech and his thought process intact at the appointment. Tr. 530. His mood was depressed and anxious. *Id.* Plaintiff had at this time been taking Risperidone for negative ruminations and panic as well as Sertraline for depression and panic since the time he was in rehabilitation for alcohol dependence in October 2004. Tr. 532, 538, 542. Plaintiff claimed he was having "frequent panic attacks" even while he was being treated with these medications. Tr. 530-531. Dr. Banzhaf diagnosed Plaintiff with depressive disorder, current nicotine dependence, alcohol dependence in early full remission, cocaine dependence in early full remission, and cannabis abuse in early full remission. Tr. 528.

Plaintiff met with Dr. Banzhaf again on September 15, 2005 for a medication management appointment. Tr. 516. Plaintiff was still taking Sertraline and Risperidone at this time, as well as Hydroxyzine to treat his anxiety and Trazodone to help him sleep. *Id.* Plaintiff told Dr. Banzhaf he had not used alcohol, cocaine, or cannabis for about one year. *Id.* Plaintiff noted "complete satisfaction" with what Dr. Banzhaf characterized as a "somewhat complicated medication regimen" during an appointment on April 27, 2006. Tr. 500-501. Plaintiff credits these psychiatric medications for "keep[ing] his mood and anxiety in good control." Tr. 501. Dr. Banzhaf found Plaintiff not to have "any major mental health or substance abuse issues" as of September 13, 2006. Tr. 487.

On November 13, 2006, less than two months before Plaintiff's DLI, Dr. Banzhaf found Plaintiff "relatively well and stable." Tr. 482. Though Plaintiff reported experiencing a panic attack several weeks before this appointment, Dr. Banzhaf's expressed goal at the time was to "maintain this man in his current state of stability." *Id.*

The record indicates Plaintiff missed numerous mental health appointments during the period for which he claims disability. On August 7, 2007, Dr. Banzhaf noted that Plaintiff was a "no show for his appointment." Tr. 458. Dr. Bahzhaf proceeded to note Plaintiff's recent history of missed appointments, indicating Plaintiff either cancelled or "no showed" his last four scheduled appointments. *Id.* Plaintiff also cancelled an appointment with Dr. Banzhaf on February 15, 2008 and failed to show up to another appointment four days later. Tr. 454. An entry from Dr. Banzhaf on February 22, 2008 notes that Plaintiff made a "recent" visit to Strong Memorial Hospital in Rochester, NY for suicidal ideations. *Id.* However, when Dr. Banzhaf asked Plaintiff about this visit to Strong, Plaintiff this time "strongly denie[d] that he was suicidal at all." Tr. 453.

Plaintiff called Dr. Banzhaf on February 26, 2008 to tell the doctor he had been "drinking again for the past couple of months." Tr. 453. Plaintiff sought entry to a detoxification facility. *Id.* On February 28, 2008, Plaintiff told Dr. Banzhaf that he had changed his mind and did not need to detox, but wished to enter an inpatient alcohol rehabilitation program instead. Tr. 451. Plaintiff was admitted to a domiciliary for alcohol rehabilitation with the Veteran's Administration in Canadaigua on March 3, 2008. Tr. 446. Plaintiff had most recently received inpatient treatment for alcohol abuse from September 27, 2004 until April 8, 2005. Tr. 556, 530. While in rehabilitation, Plaintiff indicated his "knee pain [. . .] lessened" when he was taking morphine. Tr. 440. He was discharged from the rehabilitation program on June 3, 2008. Tr. 372.

Dr. Meade, a psychiatrist, performed a psychiatric review technique ("PRT") on Plaintiff on October 10, 2008. Tr. 604. Dr. Meade concluded there was insufficient evidence to make a medical judgment, but noted affective disorders and substance addiction upon performing the PRT. Tr. 604, 618.

## III.    Discussion

### a.  Scope of Review

The Court's first role is to review the Commissioner's decision to determine whether the Commissioner applied the correct legal standards. *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). If the ALJ applied the proper legal standards below, the Court's second and final step is to determine whether the Commissioner's decision is supported by substantial evidence in the record. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). Since "an analysis of the substantiality of the evidence must also include that which detracts from its weight," the Court will review the entire record. *Quinones ex rel. Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir.1988)).

It is not the Court's role to determine *de novo* whether Plaintiff is disabled. *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Title 42 U.S.C. § 405(g) provides that the findings of the Commissioner of Social Security "shall be conclusive" provided they are supported by substantial evidence in the record. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).   Substantial evidence means "more than a mere scintilla, but something less than the weight of the evidence." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO,* 315 F.3d 97, 100 (2d Cir. 2002)

(quoting *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO ("Simpson"),* 120 F.3d 341, 346 (2d Cir.1997)).

### b.  Fed. R. Civ. P. 12(c) Standard

Rule 12(c) of the Fed. R. Civ. P. allows a party to move for judgment on the pleadings "after the pleadings are closed – but early enough not to delay trial."  This Court will grant a motion for  judgment on the pleadings when the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639 (2d Cir.1988). In considering a motion for judgment on the pleadings, the Court applies the same standard it would for a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).

The Court must accept as true factual allegations in the Complaint and draw all reasonable inferences in Plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). But the Court need not accord a presumption of truthfulness to "[l]egal conclusions, deductions, or opinions couched as factual allegations." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). To withstand a motion for judgment on the pleadings, a court must determine whether the "'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden*, 594 F.3d at 161 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

### c.  Standard for Eligibility for SSI and DIB

An individual is considered disabled for purposes of both SSI and DIB if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423

(d)(1)(A) and 132c(a)(3)(A).  A physical or mental impairment will not be considered disabling

unless it is so severe that the individual is not only unable to perform his previous work but

cannot, given his age, education and work experience, engage in any other type of substantial

gainful activity existing in the national economy. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.

1982).

In determining whether an individual is disabled under this definition, the Commissioner

must engage in the five-step sequential evaluation process outlined in 20 C.F.R. § 416.920. The

Commissioner must consider, in order: (1) the individual's work activity (20 C.F.R. §

416.920[a][4][i]); (2) the medical severity of the impairments and whether the impairments meet

the duration requirement in § 416.909 (20 C.F.R. § 416.920[a][4][ii]); (3) the medical severity of

the impairments and whether the impairments meet or equal the listings criteria in 20 C.F.R. Part

404, Subpart P, Appendix 1 (20 C.F.R. § 416.920[a][4][iii]); (4) an assessment of the

individual's residual functioning capacity and past relevant work history (20 C.F.R. §

416.920[a][4][iv]); and (5) an assessment of the individual's residual functional capacity and age,

education, and work experience to see whether he or she can make an adjustment to any other

type of work (20 C.F.R. § 416.920[a][4][v]).

The Second Circuit has characterized the sequential five-step analysis as follows:

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity. Where the
> claimant is not, the Commissioner next considers whether the
> claimant has a "severe impairment" that significantly limits her
> physical or mental ability to do basic work activities. If the
> claimant suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an impairment
> that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant
> has a listed impairment, the Commissioner will consider the
> claimant disabled without considering vocational factors such as

> age, education, and work experience; the Commissioner presumes
> that a claimant who is afflicted with a listed impairment is unable
> to perform substantial gainful activity. Assuming the claimant does
> not have a listed impairment, the fourth inquiry is whether, despite
> the claimant's severe impairment, she has the residual functional
> capacity to perform her past work. Finally, if the claimant is unable
> to perform her past work, the burden then shifts to the
> Commissioner to determine whether there is other work which the
> claimant could perform.

*Tejada*, 167 F.3d at 774. The Plaintiff will bear the general burden of proving that he or she has a

disability at steps one through four of the sequential five-step process. *Butts v. Barnhart*, 388

F.3d 377, 383 (2d Cir. 2004). When the claimant proves that he or she cannot return to his or her

prior work, the burden then shifts to the Commissioner at step five of the process to prove the

existence of alternative substantial gainful work in significant numbers in the national economy

which claimant can perform considering his or her physical and mental capabilities, age,

education, experience and training. *Berry*, 675 F.2d at 467.

### d.  ALJ Devlin's Decision and Appeal

ALJ Devlin, the second ALJ to review Plaintiff's case, followed the sequential five-step

analysis for evaluating Plaintiff's claim of disability in his decision issued on March 14, 2012.

Tr. 15-23. ALJ Devlin initially noted that Plaintiff meets the insured status requirement of the

SSA through December 31, 2006, Plaintiff's date last insured. Tr. 17. As noted above, this means

Plaintiff must demonstrate he became disabled on or prior to December 31, 2006 in order to

show entitlement for DIB. *See* 20 C.F.R. § 404.131(a).

At step one of the sequential five-step analysis, ALJ Devlin found Plaintiff has not

engaged in any substantial gainful activity since his alleged onset date of disability, November

12, 2008.[3] Tr. 17. ALJ Devlin determined at step two that Plaintiff suffered from the following severe impairments: bilateral knee pain, chronic low back pain, left hip degeneration, cervical degenerative disc disease, and depressive disorder with psychotic features. *Id.* The ALJ found these conditions "result in more than minimal limitations in the claimant's ability to perform work functions," amounting to severe impairments under the SSA. Tr. 18.  ALJ Devlin also found the following nonsevere impairments: hypertriglyceridemia, anxiety/panic attacks, and alcohol abuse that ALJ Devlin noted to be "mostly in remission." Tr. 17-18.

The ALJ found at step three that since Plaintiff's alleged onset date of disability, Plaintiff did not have any impairment or combination thereof that meets or medically equals the severity of any listed impairment under 20 C.F.R. Pt. 404, Subpt. P. App. 1. Tr. 18. ALJ Devlin first found that Plaintiff's joint disease failed to meet listing 1.02 for major dysfunction of a joint because there were no findings on appropriately medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint. *Id.* The ALJ also found the record did not include evidence of involvement of a major peripheral weight-bearing joint (such as the hip, knee, or ankle) resulting in Plaintiff's inability to ambulate effectively. *Id.*  The ALJ further found that the record did not include evidence of involvement of one major peripheral joint in each upper extremity that would result in an inability to perform fine and gross motor skills effectively. *Id.* The ALJ determined Plaintiff's mental impairments did not establish presence of the criteria of the applicable mental disorder listings in paragraph "C" of 20 C.F.R. § 404.1520(a). *Id.* ALJ Devlin found no medically documented history of a chronic organic mental

---

[3] There appears to have been a typographical error in the first ALJ's decision regarding Plaintiff's alleged onset date of disability.  Plaintiff's date of birth is November 12, 1958. Tr. 81. He turned fifty years old on November 12, 2008. Accordingly, for purposes of Plaintiff's maximum sustained work capacity, his age category changed from a "younger individual" to an "individual approaching advanced age" on that date. *See* 20 C.F.R. Pt. 404, Subpt. 4, App. 2, § 201(g).  However, ALJ Solomon's decision mistakenly notes that Plaintiff's age category changed on March 23, 2010, making that the alleged date of disability. Tr. 93. ALJ Devlin subsequently noted the apparent typographical error in the first ALJ's decision and confirmed that Plaintiff's alleged onset date was in fact the date of his fiftieth birthday, November 12, 2008. (*See* Tr. 60; ECF No.11-1, p.3, fn. 4).

or affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities. *Id.*

At the fourth step, ALJ Devlin determined Plaintiff possessed the residual functioning capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and §416.967(a). Tr. 19. At the RFC step, the ALJ found Plaintiff could occasionally lift and/or carry ten pounds, frequently lift and/or carry less than ten pounds, stand and/or walk at least two hours in an eight hour workday, use a cane for ambulation, and be limited in his ability to climb stairs, ladders, and the like. *Id.* ALJ Devlin found that, although Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms he alleges, Plaintiff's statements regarding the intensity, persistence, and limiting effects of these symptoms were "not entirely credible." *Id.* Specifically related to credibility, ALJ Devlin noted apparent discrepancies in the record regarding Plaintiff's work history during his period of alleged disability. Tr. 21. For instance, ALJ Devlin noted that Plaintiff claimed he last worked in 2004 despite him cancelling a 2006 physical therapy appointment because "there is no need to come into clinic and lose time from work." Tr. 21, 409.

ALJ Devlin accorded "great weight" to the opinion of Richard Mottern, M.D., as Dr. Mottern has a treating relationship with Plaintiff. Tr. 21. The ALJ also entitled "some weight" to the opinion of NP Coates, who, despite having a treating relationship with plaintiff, can, as a nurse practitioner, only be considered an "other source" under the SSA. *Id.* The opinion of Dr. Banzhaf,  the V.A. psychologist, and Dr. Meade, who performed the PRT on Plaintiff, were given "little weight" because neither rendered an opinion on Plaintiff's disability status. *Id.*

At step five, ALJ Devlin found that prior to November 12, 2008[4], there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed based on his age, education, work experience, and residual functioning capacity. Tr. 21-22. ALJ Devlin found that Plaintiff's RFC to perform all or substantially all requirements of a full range of sedentary work was "impeded by additional limitations." Tr. 22. ALJ Devlin relied upon the testimony of VE Julie Andrews to determine the extent to which Plaintiff's limitations eroded the unskilled sedentary occupational base. *Id.* The VE testified that given plaintiff's age, education, work experience, and RFC, Plaintiff would have been able to perform the requirements of certain representative occupations. *Id.* VE Andrews identified positions as an order clerk (255,000 positions in the national economy and 425 positions in the regional economy) and label pinker (1.3 million positions in the national economy and 455 regionally) as jobs that an individual with Plaintiff's limitations could perform. *Id.* Accordingly, at step five ALJ Devlin determined Plaintiff to be "not disabled" prior to November 12, 2008 because he found Plaintiff to be capable of making a successful adjustment to other work that existed in significant numbers in the national economy. *Id.*

ALJ Devlin did not disrupt the favorable findings for Plaintiff related to his SSI entitlement. When Plaintiff's age category changed to that of an "individual approaching advanced age" on November 12, 2008, Plaintiff's age, education, and work experience warranted a finding of "disabled" under Medical-Vocational Rule 201.14. *Id.* ALJ Devlin found there were no jobs that existed in significant numbers in the national economy that Plaintiff could perform as of November 12, 2008. *Id.* The ALJ found Plaintiff continues to be disabled under §1614(a)(3)(A) of the SSA and is thus entitled to continue receiving SSI. Tr. 23. Finally, ALJ

---

[4]As noted above, November 12, 2008 was Plaintiff's fiftieth birthday and accordingly the date his age category changed from a "younger individual" to an "individual approaching advanced age." See 20 C.F.R. Pt. 404, Subpt. 4, App. 2, §201(g)

Devlin found Plaintiff was under no disability pursuant to the SSA at any time through his December 31, 2006 DLI. *Id.*

### e.  The Commissioner's Determination Is Without Legal Error

ALJ Devlin properly followed the sequential five-step analysis outlined by the SSA. 20 C.F.R. §§ 404.1520, 416.920. The ALJ also applied the proper legal standards in weighing the opinions of various treating sources. Accordingly, there is nothing to support any contention that the Commissioner failed to apply the proper legal standard below.

As noted above, the Appeals Council directed the second ALJ to further develop the record in relation to three particular areas. Tr. 98. First, the ALJ was to further evaluate Plaintiff's mental impairment in accordance with the special technique under 20 C.F.R. 404.1520a(c) and 416.920a(c). Tr. 99. Second, the Appeals Council instructed the ALJ to further consider Plaintiff's residual functioning capacity, including "rationale with specific references to evidence of record in support of addressed limitations." *Id.* Finally, if warranted by the expanded record, the Appeals Council instructed the ALJ to develop the record by soliciting testimony from a vocational expert to clarify the effect of the assessed limitations established by the record as a whole. *Id.* The Appeals Council envisioned that the VE would identify appropriate jobs for Plaintiff and the availability of such jobs in the national and local economies. *Id.* As noted above, ALJ Devlin complied with the Appeals Council by developing the record in accordance with the Appeals Council's instructions on remand.

I find that ALJ Devlin properly followed the instructions of the Appeals Council and that his decision is without legal error.

### f.   The Commissioner's Determination Is Supported By Substantial Evidence

At the outset, Plaintiff contends the record has been "fully developed" after proceedings before two ALJs. ECF No.10-1 at 33. Defendant likewise does not suggest that the administrative record requires further development. Accordingly, Plaintiff seeks a remand for the sole purpose of calculating and awarding benefits. *Id.* at 33-34. Based on the record as it now stands, Plaintiff argues the Commissioner's decision is not supported by substantial evidence. *Id.* at 3. Plaintiff alleges that three specific errors in the ALJ's findings warrant reversal: that Plaintiff does not meet Listing 1.02A of the Listing of Impairments, ALJ Devlin's determinations related to credibility, and finally the ALJ's findings related to the limitations Plaintiff alleges he suffered as a result of certain severe impairments. ECF No.10-1 at 20, 27, 31. Upon thorough consideration of the record, I conclude the ALJ's finding that Plaintiff did not become disabled before November 12, 2008 is supported by substantial evidence in the record.

### 1.   Listing of Impairments

Plaintiff claims ALJ Devlin erred in finding that his knee condition does not meet Listing 1.02A of the Listing of Impairments. One who establishes an ailment that meets or equals a listed impairment creates an irrebuttable presumption of disability. *Shaw v. Chater,* 221 F.3d 126, 132 (2d. Cir. 2000). Plaintiff claims a major dysfunction of his right knee, a major weight-bearing joint, under Listing of Impairments 1.02A. Such an impairment is:

> "[c]haracterized by gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankyloses, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankyloses of the affected joints(s). With: A. involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively [. . .]"

Section 1.00B2(b) elaborates on the meaning of "inability to ambulate effectively." An inability to ambulate effectively means "an extreme limitation of the ability to walk," that is, an impairment interfering "very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 1.00B2(b)(1). One who is able to ambulate effectively is "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out the activities of daily living." 20 C.F.R. § 1.00B2(b)(2). The inability to walk without use of a walker, two crutches, or two canes is listed among the examples of ineffective ambulation. *Id.*

There is substantial evidence to support ALJ Devlin's finding that Plaintiff's right knee condition did not meet or medically equal one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1 and that Plaintiff could ambulate effectively during the period he claims he is entitled to receive DIB.

ALJ Devlin found no appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankyloses. Tr. 18. ALJ Devlin found the record lacked evidence of involvement of a major peripheral weight-bearing joint that results in Plaintiff's inability to ambulate effectively. *Id.* Furthermore, the ALJ found insufficient evidence in the record of involvement of a major peripheral joint in each of Plaintiff's upper extremities that results in Plaintiff's inability to perform fine and gross movements effectively, pursuant to § 1.00B2(c). *Id.* Importantly, ALJ Devlin's decision notes that "[the] record does not contain any statements from a treating source regarding disability prior to December 31, 2006." Tr. 20.

On January 4, 2006, Dr. Ziv noted Plaintiff did not possess bilateral knee deformity or effusion. Tr. 506. On January 16, 2007, an MRI on Plaintiff's right knee revealed his lateral and medial collateral complexes to be intact. Tr. 343-345. Radiologist Angelo DelBalso, who viewed

the MRI, found no gross abnormalities in Plaintiff's medial meniscus and identified only "small/moderate" joint effusion and chondromalacic changes in the medial compartment of Plaintiff's right knee. Tr. 344-345.

On April 11, 2008, Dr. McKenzie performed a physical evaluation and noted no effusion in either of Plaintiff's knees. Tr. 430. Dr. McKenzie found "full flexion and extension of both knees." *Id.* Plaintiff at the time said he was feeling "comfortable at rest," yet felt pain in both knees during weightbearing activities. *Id.*

ALJ Devlin's finding that Plaintiff does not suffer from an inability to ambulate effectively as defined in  20 C.F.R. § 1.00B2(b)(2) is supported by substantial evidence in the record. One who is unable to walk without a walker, two crutches, or two canes is unable to ambulate effectively pursuant to the Listings of Impairment. 20 C.F.R. § 1.00B2(b)(2). The record contains substantial evidence that Plaintiff did not require the assistance of a walker, two crutches, or two canes to ambulate effectively during the relevant time.

The record contains ample evidence of Plaintiff's subjective knee pain, but insufficient evidence of his inability to ambulate effectively. Notably, in 2004 Plaintiff reported being "extremely active" working as a contractor, a job that involved going "up and down ladders all day long." Tr. 557.

There are indications in the record that Plaintiff had been provided a cane to assist with walking. Tr. 44, 64-65, 513, 571, 513.  Additionally, Plaintiff was issued crutches following his 2002 knee surgery. Tr. 573. But the record falls short of proving that before his DLI Plaintiff required a walker, two crutches, or two canes to ambulate effectively, as provided in 20 C.F.R. § 1.00B2(b)(2). Plaintiff was walking without an assistive device during his appointment with physical therapist Brian Westlake on June 29, 2006, just six months before his DLI and within

the time of his claimed disability. Tr. 491. Plaintiff told the physical therapist at this appointment that he was currently working in a job requiring prolonged standing, lifting, and bending. Tr. 489.

Plaintiff was provided stabilization braces on both knees on July 24, 2006. Tr. 490. At the time, however, he again claimed to be doing prolonged standing, lifting, and bending for his job. Tr. 489. Plaintiff claimed to be using a single cane and sometimes a walker to ambulate in the time period between December 2005 and November 2008. Tr. 63-65, 513.

Based on the above, ALJ Devlin's finding that Plaintiff's knee condition does not meet Listing 1.02A of the Listing of Impairments is supported by substantial evidence in the record.

## 2. Credibility

Plaintiff seeks reversal of the Commissioner's DIB determination on the grounds that ALJ Devlin improperly evaluated his credibility.   ECF No. 10-1 at 27. I find the credibility determinations by ALJ Devlin, who personally observed and sought testimony from Plaintiff, are supported by substantial evidence in the record.

ALJ Devlin found Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms Plaintiff alleged. Tr. 19. However, the ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms [to be] not entirely credible." *Id.*

Though the record establishes that Plaintiff has not reported earning an income since 2001 (Tr. 246), the record is rife with contradictory information concerning Plaintiff's work history and activity levels during the period he claims he was disabled. *See* Tr. 489, 492, 557. Specific to credibility, ALJ Devlin noted apparent discrepancies in the record regarding Plaintiff's work history. Though Plaintiff testified he last worked in 2004, and his earnings

27

reports list no income since 2001, ALJ Devlin noted that Plaintiff cancelled a July 2006 physical therapy appointment because he did not want to miss work.[5] Tr. 19. At a June 29, 2006 appointment, physical therapist Brian Westlake indicated Plaintiff "works as a tool maker" and as a result was required to stand, lift, bend, and twist for his job. Tr. 492. Plaintiff also discussed presently working as a tool maker in another July 2006 medical appointment. Tr. 489. Again on December 20, 2006, medical records indicate that Plaintiff discussed his present work as a tool maker and the physical movements that job required. Tr. 475.

The record contains frequent illusions to Plaintiff's job as a tool maker in the present tense over a six-month period at a time highly relevant to the determination of Plaintiff's disability status. *See* Tr. 19, 475, 489. 492. Plaintiff claims this evidence does not undermine his credibility because he admits to several attempts to go back to work in 2002 and 2004, including efforts to train student apprentices in his field. ECF No. 10-1 at 18. But references in the record to Plaintiff's continued working or job-searching are not limited to the 2002 and 2004 time frames he claims. *See* Tr. 409, 475, 492. For these reasons, I find ALJ Devlin's determination that Plaintiff was "not entirely credible" to be supported by substantial evidence in the record.

Plaintiff testified before ALJ Solomon that he "experimented with [cocaine] once many, many years ago." Tr. 45. But abundant additional evidence in the record indicates Plaintiff used cocaine more frequently and recently than "once many, many years ago." *See* Tr. 515, 526. For example, in 2005 Plaintiff told Dr. Banzhaf that he last used cocaine in June 2004. Tr. 526. Dr. Banzhaf diagnosed Plaintiff with cocaine dependence in sustained full remission in December 2005. Tr. 511. This is consistent with Plaintiff's admission in 2008 that he had last used cocaine four years earlier. Tr. 442. Upon his discharge from an alcohol rehabilitation program in June

---

[5] ALJ Devlin cites a physical therapy note from July 19, 2006 that stated: "Pt. explained there is no need to come in to clinic and lose time from work when he can do all the exercises at home." Tr. 409.

2008, Plaintiff stated he began using cocaine when he was twenty-three years old and used approximately once a week during his period of highest use. Tr. 370.

I also note that ALJ Devlin did *not* find Plaintiff to be wholly lacking in credibility. Contrary to Plaintiff's contention, the ALJ's finding that Plaintiff was "not entirely credible" with regard to "the intensity, persistence, and limiting effects" of his symptoms does not amount to the ALJ entirely "discrediting" Plaintiff. *See* ECF No.10-1 at 30, Tr. 19.

ALJ Devlin's determinations related to Plaintiff's credibility are supported by substantial evidence in the record.

### 3. Limitations from Other Alleged Impairments

Plaintiff contends ALJ Devlin failed to incorporate limitations he alleges he suffered due to various other ailments. ECF No. 10-1 at 31. Plaintiff claims the ALJ did not incorporate limitations from plaintiff's depressive disorder with psychotic features, as well as his wrist pain, in ultimately determining Plaintiff was not disabled before November 12, 2008. *Id.* In fact, ALJ Devlin did consider these alleged impairments in making his determination of disability and RFC, and the ALJ's finding that these alleged impairments are not disabling is supported by substantial evidence in the record. *See* Tr. 19.

Plaintiff argues ALJ Devlin committed reversible error by failing to incorporate limitations from "severe depressive disorder with psychotic features" and wrist pain. ECF No. 10-1 at 31. In directing the ALJ on remand to further evaluate Plaintiff's mental impairments, the first Appeals Council decision noted Plaintiff "has a history of alcoholism and depression" and observed that Plaintiff had multiple stints in rehabilitation for alcohol abuse. Tr. 98. Plaintiff characterized his own mood and anxiety as in "good control" as of April 27, 2006. Tr. 501. Dr. Banzhaf observed Plaintiff to be "relatively well and stable" with respect to his mental health

during the period of alleged disability. Tr. 482. Though Plaintiff claims disabling mental health conditions in this period, his psychiatrist continually indicated between December 2005 and November 2006 that his goal was to maintain Plaintiff's current state of psychiatric stability. Tr. 482, 501, 512. Dr. Banzhaf found no "major mental health or substance abuse issues" on September 13, 2006. Tr. 487.

ALJ Devlin concluded the record does not include evidence of involvement of a major peripheral joint in each of Plaintiff's upper extremities (shoulder, elbow, wrist-hand) that would result in Plaintiff's inability to perform fine and gross movements effectively under 20 C.F.R. § 1.00(B)(2)(c). Though the record contains limited references to Plaintiff's complaints of hand pain (*See* Tr. 495), the record falls well short of establishing that Plaintiff's claimed upper extremity limitations made him unable to perform fine and gross movements effectively. There is no record evidence from a treating source that establishes Plaintiff suffered disabling hand or wrist conditions prior to December 31, 2006. Tr. 20. Though ALJ Devlin found Plaintiff's wrist ailments "result in more than minimal limitations in the claimant's ability to perform work functions," amounting to severe impairments under the SSA, ALJ Devlin incorporated these limitations in his determination of Plaintiff's RFC before November 12, 2008. Tr. 18.

The remainder of ALJ Devlin's determination is supported by substantial evidence in the record. ALJ Devlin's determination of Plaintiff's RFC properly rested on testimony and hypotheticals preferred by VE Andrews, in accordance with the Appeals Council's instructions. Tr. 22.

Plaintiff contends that, after two separate ALJ determinations, the record has been fully developed and requires no further fact-finding.[6] I agree.

---

[6] "It is submitted that all relevant aspects of the record have been developed." ECF No.10-1.

IV.   **Conclusion**

For the reasons set forth above and after careful consideration of the entire record, I find the Commissioner's decision is supported by substantial evidence in the record and not erroneous as a matter of law. I note that none of the above changes Plaintiff's entitlement to Supplemental Security Income under Title XVI of the Social Security Act. Defendant's motion for judgment on the pleadings (ECF No. 11) is granted, Plaintiff's motion for judgment on the pleadings (ECF 10) is denied, and Plaintiff's Complaint (ECF No. 1) is hereby dismissed. The Clerk of Court is directed to close Civil Case No. 13-CV-06422.

IT IS SO ORDERED.

Dated: May 11, 2015
       Rochester, New York

HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court